REFORM OF SCHOHARIE COUNTY, Lawrence Bush, Wayne Cooper, Andrew L. Mason, Susan McGiver, Denise Schermerhorn, Robert Schermerhorn, Leo Siemion, Robert D. Smith, Ronald L. Springstead, Wayne R. Stinson, and Daryl Van Dyke, Plaintiffs,

v.

SCHOHARIE COUNTY BOARD OF SUPERVISORS, Defendant.

No. 95–CV–1074.

United States District Court, N.D. New York.

Aug. 22, 1997.

Jordan & Walster, Roxbury, NY (Herbert Jordan, of Counsel), for Plaintiffs.

Schoharie County Attorney, Cobleskill, NY (Michael A. West, of Counsel), for Defendant.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

Plaintiffs move for summary judgment in this action challenging as unconstitutional the method of electing supervisors to the Board of Supervisors of Schoharie County. The court entertained oral argument at its regular motion term in Albany, New York on November 27, 1995, and decides the motion herein.

### I. BACKGROUND

The New York State Legislature established the County of Schoharie in the year 1795. The County is essentially agrarian in character, encompassing some 675 square miles in the eastern central area of the state. According to the 1990 census, the County's population is 31,859—noticeably less than its peak population of 37,592 recorded in the 1870 census. The County is divided into 16 towns, ranging in size from Cobleskill with 7,270 residents (including students at the State University of New York campus) to Blenheim with 332. The newest of these towns, Richmondville, was formed in 1849.

The County is governed by the defendant Board of Supervisors. Each of Schoharie County's 16 towns elects one supervisor to either a 2 or 4 year term on the Board. A supervisor was first elected in 1791, and the current arrangement has probably been in existence since 1850, the year after the last town was constituted. In order to account for the disparate population of the different towns, and to effectuate the "one man, one vote" principle, the Board has used a weighted voting system since 1975. Under this method, each supervisor is given a number of votes roughly proportionate to his or her town's percentage share of the total population of the County, as reflected by the latest national census. *See* Schoharie County Local Law No. 4 of the year 1994, Ex. 1 att'd to Pls.' Notice of Motion, Doc. 5. Under the present apportionment for example, the supervisor for the town of Middleburgh, which is inhabited by 3,296 persons, is given 320 votes in matters requiring the majority vote of the Board, while the supervisor of Summit, populated by 973 people, wields 97 votes. *Id.*

at 2. In matters requiring a supermajority of two-thirds of the Board vote the Middleburgh and Summit supervisors are allocated 157 and 48 votes respectively. *Id.* at 3.[1]

Plaintiff REFORM "is an unincorporated association formed for the purpose, among others, of securing reform of political institutions in the county." Compl., Doc. 1, ¶ 4. Plaintiffs Wayne Cooper and Daryl Van Dyke are residents of Cobleskill. Plaintiff Susan McGiver resides in the town of Schoharie. Plaintiff Robert D. Smith is the supervisor of the town of Wright. Presumably he also lives there. The residences of the other individual plaintiffs are not apparent from the record. Plaintiffs have instituted suit pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, contending that the practice of electing one supervisor each from electoral districts of widely disparate populations—*viz.* the towns—violates the Equal Protection Clause of the Fourteenth Amendment. They seek declaratory and injunctive relief. Dispensing with the usual exegesis on the standards for summary judgment motions pursuant to Rule 56(c), this court commences to analysis.

## II. DISCUSSION

■ The court's decision today is substantially informed by Chief Judge McAvoy's recent case concerning the Board of Supervisors in adjoining Delaware County. *Roxbury Taxpayers Alliance v. Delaware County Board of Supervisors,* 886 F.Supp. 242 (N.D.N.Y.1995), *aff'd,* 80 F.3d 42 (2d

Cir.), *cert. denied sub nom. MacDonald v. Delaware County Board of Supervisors,* —— U.S. ——, 117 S.Ct. 189, 136 L.Ed.2d 127 (1996). That case, as conceded by plaintiffs herein, upheld a voting "system virtually identical to Schoharie's." Pls.' Mem. Law, Doc. 6, at 4. To the extent plaintiffs argue that the Constitution requires without exception that Schoharie County's Board of Supervisors be elected from districts of nearly equal population, the Second Circuit's opinion in *Roxbury* rejecting that contention is controlling precedent.

In *Roxbury* Judge McAvoy observed

that while the Supreme Court may prefer electoral districts of equal population, local governments still have the flexibility to organize themselves in ways that meet the needs of the local communities, as long as they are within reasonable constitutional parameters.

886 F.Supp. at 251.

One such parameter is that the deviation between a town's percentage share of the county's population and the supervisor's allocated votes as a percentage of the Board's total votes cannot be too large. The deviation in Delaware County was 0.92%, "a figure that is certainly within constitutional limits." 80 F.3d at 49. But the Court of Appeals in *Roxbury* also noted that it had previously upheld a deviation of 7.3%. *Id.* (specifically, in *League of Women Voters v. Nassau County Board of Supervisors,* 737 F.2d 155 (2d Cir.1984), *cert. denied,* 469 U.S. 1108, 105

---

1. The weighting system is not strictly proportional to the numbers established by the last decennial census. Instead it is somewhat adjusted by the application of the Banzhaf index of voting power. As understood by the supervisors, "the Banzhaf index readjusts the number of weighted votes each supervisor may cast to theoretically approximate the chances each supervisor would have had to cast a deciding vote if the votes were not weighted." Smith Aff. att'd to Doc. 5, ¶ 7; *cf.* Brown Aff., Doc. 7, ¶ 18 ("[T]he weighted voting plans were derived by use of the 'Banzhaf' system, which attempts to render to each member of the Board, in a mathematical sense, with the ability to affect the decisions of the Board at a rate very nearly proportional to the size of his or her constituency."). The United States Supreme Court has criticized the Banzhaf index, most recently in *Board of Estimate v. Morris,* 489 U.S. 688, 697–99, 109 S.Ct. 1433, 1440–41, 103

L.Ed.2d 717 (1989). Plaintiffs apparently have no quarrel with the use of the Banzhaf index however: "In this action plaintiffs do not attack the minor differences between the votes allotted by the Banzhaf method ... and those which would be allotted by strictly arithmetical computation." Pls.' Mem. Law, Doc. 6, at 2 n. 3.

The votes allocated to the supervisor of Cobleskill are also less than would be expected because the Board "determined not to include the student population [of the State University of New York at Cobleskill], thus resulting in the population number of 5,670 contained as the population for weighted voting purposes for the Town of Cobleskill." Brown Aff., Doc. 7, ¶ 14. That decision is also not at issue in this case. *See* Pls.' Mem. Law, Doc. 6, at 2 n. 2 ("[U]sing the lower figure makes no material difference as to the issues posed.").

S.Ct. 783, 83 L.Ed.2d 778 (1985)). And the United States Supreme Court has accepted a deviation of 11.9%. *Abate v. Mundt,* 403 U.S. 182, 184, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399 (1971). Using the method of calculation applied by Judge McAvoy and subsequently approved by the Second Circuit in *Roxbury,* the maximum deviation in Schoharie County is 2.1% for those matters requiring a majority vote [2] and 2.72% for a vote requiring a supermajority of two-thirds.[3] Both figures are well under *League of Women Voters'* 7.3% deviation and *Abate*'s 11.9%, and thus do not run afoul of the Equal Protection Clause.

■ The electoral districts should be "free from any taint of arbitrariness or discrimination." *Brown v. Thomson,* 462 U.S. 835, 843, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983) (internal quotations omitted). Given that Schoharie County's 16 towns have each been electing one supervisor to the defendant Board for the past 147 years or so, there appears to be little chance of either an arbitrary division of electoral districts, or an ongoing discriminatory conspiracy. Indeed, the maintenance of historical boundaries is one important consideration in permitting disparately populated voting districts. *Roxbury,* 80 F.3d at 48. As it is in Delaware County, *id.* at 49, no single town has a majority of Schoharie County's population, and thus no single supervisor can dominate the Board. The following characteristics of Delaware County are also in evidence in Schoharie County:

> The Board's small size allows for the efficient conduct of county business and a greater degree of flexibility than would a Board of substantially greater size. By having each town elect a representative, the County assures that the interests of every town, no matter how small, are considered by the Board, and that no town

suffers from permanent lack of representation on account of its size. In this way, the County's method of local governance preserves not only traditional allegiances, but assures that no voter is effectively disenfranchised by reason of place of residence. *Id.*

■ Plaintiffs seek to distinguish *Roxbury* on one ground. They contend that the non-voting functions of supervisors are also critical. Such functions include "service on committees, public and private discussion and debate, communications to and from constituents, communication with county executive officers, and development of ideas and proposals for county legislation and programs." Pls.' Local Rule 7(f) Statement, Doc. 5, ¶ 9. The committee work seems of particular importance to plaintiffs. The Board of Supervisors has fifteen committees with seven members each. Brown Aff., Doc. 7, ¶ 19. The Chairman of the Board makes appointments to the committees. When in committee, each supervisor yields one vote regardless of the percentage of the County's population that supervisor represents. *Id.* ¶ 20.

Plaintiff complains that the district and circuit courts in *Roxbury* gave this line of argument short shrift. This court is not so sure. The Second Circuit for instance, in summarizing the arguments made before Judge McAvoy, related that the

> [p]laintiffs also contended that weighted voting was insufficient to assure them equal representation because, given the Supervisors' equal ability to participate in, inter alia, floor debates and committee work, Board members from less populous towns had disproportionate ability to influence County legislation.

80 F.3d at 45.

The panel nevertheless concluded that "there is nothing in the record to indicate that Dela-

---

**2.** Excluding students at SUNY at Cobleskill, *see supra* note 1, Cobleskill is the only underrepresented town during majority votes, with 18.74% of the population and 16.84V of the total Board votes for a deviation of –1.9. The town of Sharon is the most overrepresented with 6.25% of the County's population and 6.45% of the vote for a deviation of 0.2. The total deviation for majority votes is thus 2.1.

**3.** Again excluding SUNY students, Cobleskill is the only overrepresented town in supermajority voting with 20.94% of the total Board votes, yielding a deviation of 2.2. Middleburgh is the most underrepresented during those votes, with 10.89% of the population and 10.37% of the votes, producing a deviation of –0.52. The total deviation is 2.72.

ware County's weighted-voting system provides representation that is not qualitatively fair and effective." *Id.* at 49. Arguably, the conclusion that there is no qualitative unfairness in Delaware County's similar system disposes of the notion that there is any constitutional infirmity inherent in the nonvoting functions of Schoharie County's supervisors. That qualitative judgment is buttressed by the affidavits submitted by both parties in this matter. The affiants, both town supervisors in the County, are in agreement that a negative committee vote, while no doubt persuasive upon the Board, cannot prevent a supervisor from making a case for his or her resolutions. *Compare* Smith Aff. att'd to Doc. 5, ¶ 10 ("Should a proposed action be voted down in committee it may still be voted on by the full Board of Supervisors under prescribed circumstances.") with Brown Aff., Doc. 7, ¶ 20 ("Even if a negative recommendation is made to the Board, the Board members are still able to consider such matter upon motion, or amendment to a resolution. Thus, matters of interest do not become logjammed in Committee.").

Plaintiff relies on three opinions by three judge district courts rejecting weighted or fractional voting in *state* legislatures because of the implications on nonvoting duties. *Burns v. Gill,* 316 F.Supp. 1285, 1300–01 (D.Haw.1970); *Bannister v. Davis,* 263 F.Supp. 202, 209 (E.D.La.1966); *WMCA, Inc. v. Lomenzo,* 238 F.Supp. 916, 923–24 (S.D.N.Y.1965).[4] The *Lomenzo* court however "express[ed] no opinion on the use of fractional or weighted voting.. in governmental organs below the state level." *Id.* at 924 n. 2. Plaintiffs argue that this caveat was necessary because Lomenzo predates the Supreme Court's extension of the "one man, one vote" rule to local governmental units in *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968).

■ But the New York Court of Appeals decided *Franklin v. Krause,* 32 N.Y.2d 234, 298 N.E.2d 68, 344 N.Y.S.2d 885 (1973), after *Avery.* The *Franklin* court rejected an equal protection challenge to Nassau County's weighted voting system. On appeal, the United States Supreme Court dismissed the case for want of a substantial federal question. 415 U.S. 904, 94 S.Ct. 1397, 39 L.Ed.2d 461 (1974). This type of disposition is considered to reach the merits and creates binding precedent. *Roxbury,* 886 F.Supp. at 247–48 & n. 8. *Franklin* referred to another case, *Schneider v. Rockefeller,* 31 N.Y.2d 420, 293 N.E.2d 67, 340 N.Y.S.2d 889 (N.Y.1972), to explain why weighted voting systems acceptable at the county level are not to be suffered at the state legislative or congressional level:

> There may be good reason for treating local government apportionment as a distinct problem. As the court noted in *Abate [v. Mundt,* 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971) ], local legislative bodies have fewer members and local legislative districts have fewer voters than their State and national counterparts. Thus, it may be more difficult to devise apportionment plans that comply with numerical equality at the local level. Furthermore, there are over 80,000 units of local government serving various functions. A certain flexibility may, therefore, be desirable to facilitate intergovernmental cooperation at this level.

> 31 N.Y.2d at 428 n. 3, 293 N.E.2d at 71 n. 3, 340 N.Y.S.2d at 895 n. 3.

For these reasons, this court finds that the objections to weighted voting made in respect to state level bodies in *Burns, Bannister,* and *Lomenzo* have little application in the case of Schoharie County. We can see how weighted voting at, for instance, the level of the U.S. House of Representatives could lead to serious nonvoting-related constitutional problems. Even with weighted voting, a congressman representing only 150,000 people can presumably maintain better communications with his constituents than a congressman representing the typical district of 585,000.

On the other hand, even the supervisor of the largest town in Schoharie County, Cobleskill, need only be accessible to some 5,670

---

4. *Lomenzo's* complicated subsequent history does not address this issue and we will not reproduce it.

people. Although that number is several times larger than the 332 people the Blenheim supervisor represents, there is no evidence that there is a qualitative difference in the voters' access to their elected representative. As the Gilboa supervisor relates in his affidavit, the supervisors of this small county are generally accessible to anyone with any town or county concerns. Brown Aff., Doc. 7, ¶ 24. Tellingly, there is no affidavit or any other credible evidence that anyone in the more populous towns of Schoharie County have experienced difficulty in reaching their supervisor. Perhaps in a very populous county, plaintiffs' arguments would be more persuasive—but of course in a highly populated county, it would be more feasible to implement population-equivalent single member districts.

For the discussed reasons, this court rejects the argument that Schoharie County's weighted voting system runs afoul of the Equal Protection Clause. To the extent we have not specifically addressed some nonvoting duties, such as debate and discussion with fellow supervisors, the preceding rationales would apply similarly and yield the same conclusions.

 Although the court has denied plaintiffs' motion on the merits already, we touch briefly on standing. First, it is beyond peradventure that the organizational plaintiff, REFORM, lacks standing to pursue these claims in its own right. *Roxbury,,* 886 F.Supp. at 245. As for the individual plaintiffs, the court is uncertain. Residents of Cobleskill are underrepresented in simple majority voting situations when every other county resident is overrepresented. The situation is reversed when a supermajority of two-thirds is required. Chief Judge McAvoy solved this conundrum in *Roxbury* by comparing the degree of overrepresentation with the degree of underrepresentation to determine which was greater. *Id.* at 245 n. 4. This court however is not sure a simple mathematical comparison will suffice to answer the standing question. It may be that it is more desirable to be overrepresented in supermajority voting than in simple majority matters, possibly because more important issues are reserved for the former situation. On the other hand, simple majority voting may be much more prevalent than the rare supermajority vote, making overrepresentation in simple majority matters more valuable. From this record, the court cannot conclude one way or the other, so no opinion is expressed on the standing of the individual plaintiffs. In light of the court's view of the merits however, this is of no moment.

### III. CONCLUSION

Plaintiffs' motion for summary judgment is DENIED. Although defendant has not cross-moved, no disputed issues of material fact remain for decision and summary judgment may properly be granted to defendant. *Roxbury,* 886 F.Supp. at 254–55. The case is consequently DISMISSED and the clerk of the court is directed to enter final judgment in favor of the defendant and against plaintiffs.

It is So Ordered.